**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 11, 2026

**By Email and ECF**

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Yire Gomera Lopez*, 25 Cr. 602 (JPO)**

Dear Judge Oetken:

The Government respectfully submits this letter in advance of the sentencing of Yire Gomera Lopez, scheduled for September 18, 2026, for her participation in a fentanyl distribution conspiracy that mailed more than 130 kilograms of counterfeit pills containing fentanyl to customers across the United States and that killed a man in Raleigh, North Carolina (the "Victim"). For the reasons set forth below, the Government submits that a sentence of 68 months' imprisonment, followed by three years of supervised release, is warranted. Such a sentence would reflect the gravity of the defendant's crime, promote respect for the law, and provide necessary deterrence, both to the defendant personally and to others who might be tempted to engage in similar conduct.

## I. Offense Conduct

The proliferation of unregulated online pharmacies has fueled the nation's fentanyl epidemic, enabling drug traffickers to peddle direct-to-consumer counterfeit pharmaceuticals, which are devoid of the medication they purport to contain and are instead comprised of deadly narcotics like fentanyl and its analogues. Many customers are unaware of the true nature of the drugs being peddled to them; others know, but nonetheless are exposed to grave overdose risk stemming from the variable potency inherent in illicit manufacturing processes.

Fentanyl is a synthetic opioid approximately fifty times more potent than heroin and fifty to 200 times more potent than morphine. Two milligrams, an amount roughly equivalent to ten to fifteen grains of table salt and small enough to rest on the tip of a pencil, is enough to kill a person. Synthetic opioids are now the most common drugs involved in overdose deaths in the United States, killing more than 150 Americans each day, and fentanyl is the leading cause of death for Americans between the ages of 18 and 45.

Those figures explain why counterfeit pharmaceuticals occupy a category of their own. A powder sold as heroin or as fentanyl carries no representation about its dose, and the buyer knows

they are handling an unknown quantity of an unknown substance. A tablet pressed to the color, shape, and size of a commercially manufactured pill, stamped with that pill's identifying imprint, represents the opposite. It tells the buyer exactly what they are holding and exactly how much of it. The Drug Enforcement Administration has warned the public that counterfeit pills may contain lethal amounts of fentanyl or methamphetamine and are extremely dangerous precisely because they often appear identical to legitimate prescription medication.

This conspiracy trafficked in that deception for profit. From at least in or about November 2024 through in or about June 2025, the defendant and her co-defendant and boyfriend, Gregory Cabral Rodriguez, operated a mail-order narcotics business out of two apartments in Yonkers, New York. (PSR ¶¶ 8-26). The business had a simple and highly scalable model: receive fentanyl pills that had been stamped to look like legitimate pharmaceuticals, vacuum-seal them, wrap them in bubble wrap, and drop them in the mail in United States Postal Service Priority envelopes bearing fraudulent return addresses. (PSR ¶¶ 12-23, 33-34). Customers ordered online and paid electronically, believing they were purchasing legitimate pills. (*See* PSR ¶ 31).

Beginning in November 2024, Cabral Rodriguez rented a storage unit in Hawthorne, New Jersey, and took delivery there of two 500-kilogram pallets of microcrystalline cellulose, a binding agent used in the illicit manufacture of counterfeit pills. The first pallet was delivered on November 14, 2024, and was received and handled by Cabral Rodriguez and the defendant. (PSR ¶¶ 7-11, 31). The second pallet was delivered on February 28, 2025, and was received and handled by Cabral Rodriguez. (PSR ¶¶ 10-11). A metric ton of binding agent is an industrial-scale input, sufficient to press many hundreds of thousands of counterfeit tablets.

The volume of outbound mail matched. On March 7, 2025, law enforcement officers followed Cabral Rodriguez as he traveled to three separate post offices in Mount Vernon and the Bronx and deposited more than thirty Priority envelopes for mailing. (PSR ¶¶ 12-15). Three envelopes retained that day contained approximately 166 grams of mixtures and substances containing fentanyl, pressed into pills stamped "M-367" and "E-712" to resemble hydrocodone and oxycodone tablets. (PSR ¶ 17). On April 8, 2025, Cabral Rodriguez mailed approximately 21 more envelopes from a post office in Yonkers; a retained envelope contained approximately 18.3 grams of fentanyl mixtures pressed as "M-30" pills. (PSR ¶¶ 18-19). On April 30, 2025, he mailed roughly fifteen more from two post offices, and retained envelopes again tested positive for fentanyl, this time in pills stamped "K-25." (PSR ¶¶ 20-23).

On June 3, 2025, law enforcement officers executed a search warrant at the apartment the defendant shared with Cabral Rodriguez. (PSR ¶ 25). Cabral Rodriguez attempted to flee through a bedroom window and was arrested. (PSR ¶ 25). Inside the bedroom, officers recovered approximately 50 kilograms of pills in two plastic storage bins, the same bins that surveillance video had captured the defendant and Cabral Rodriguez carrying between apartments five weeks earlier, along with a drug ledger, a scale, a label printer, vacuum-sealing equipment, bubble wrap, and a supply of USPS boxes and envelopes. (PSR ¶¶ 22, 26). The pills tested positive for fentanyl and methamphetamine, among other substances. (PSR ¶ 26).

### A. The Defendant's Role

The defendant handled much of the financial and administrative functions of the business. Between approximately November 2024 and June 2025, her conduct in furtherance of the conspiracy included the following: (i) using her CashApp and other mobile payment accounts to receive payments from online drug customers; (ii) helping Cabral Rodriguez maintain a handwritten ledger of those drug payments; (iii) purchasing pill-pressing and packaging materials, including binding agents, a label printer, and a scale; (iv) transporting pill binding agent during the November 2024 visit to the storage facility with Cabral Rodriguez; and (v) transporting narcotics, including during the 2025 apartment move. (PSR ¶ 31). Surveillance video from inside the defendants' building captured the two of them carrying empty USPS boxes and bubble wrap into their apartment on the evening of March 7, 2025, hours after Cabral Rodriguez's post office run, and moving bubble wrap and the storage bins of pills out of that apartment and into a new one on the evening of April 30, 2025. (PSR ¶¶ 16, 22).

The defendant also helped maintain the premises out of which the operation ran. She and Cabral Rodriguez lived in and used both apartments for the manufacture and distribution of controlled substances.

### B. The Death Resulting from the Conspiracy

On March 13, 2025, the Victim was found dead inside his apartment in Raleigh, North Carolina. (PSR ¶ 32). The North Carolina Office of the Chief Medical Examiner determined that he died of acute fentanyl and benzodiazepine toxicity. (PSR ¶ 32).

The Victim was a repeat customer of the defendant. The defendant and Cabral Rodriguez sent him at least three packages of suspected fentanyl in the weeks before his death: one sent on or about February 15, 2025, and delivered on or about February 18; one sent on or about February 26, 2025, and delivered on or about March 1; and one sent on or about March 7, 2025, and delivered on or about March 10. (PSR ¶ 33). Images of shipping labels bearing the Victim's name and/or the same fraudulent return addresses used to ship these packages to the Victim were recovered from Cabral Rodriguez's cellphone. (PSR ¶ 33).

A fourth package arrived after the Victim was already dead. It was among the eighteen packages mailed on March 7, 2025, and it was delivered to his address on or about March 13, 2025, the day his body was found. (PSR ¶ 34). Law enforcement recovered it, unopened, from his apartment building. Inside were pills resembling pharmaceutically manufactured tablets, certain of which laboratory-tested positive for fentanyl. (PSR ¶ 35). An image of that shipping label, alongside an image of the pills, was also found on Cabral Rodriguez's phone. (PSR ¶ 35).

The defendant did not know the Victim. She did, however, provide critical support for the operation that led to his death. She processed payments from customers like him, recorded those payments in the ledger, bought the binder and the label printer that turned bulk fentanyl into pills that looked like medicine, and carried the bins in which those pills were stored. The Victim's death is an entirely foreseeable consequence of a business the defendant helped run.

## II. Procedural History

On June 18, 2026, Gomera Lopez appeared before this Court and pled guilty, pursuant to a written plea agreement dated May 27, 2026 (the "Plea Agreement"), to a lesser-included offense of Count One of the Indictment: conspiring to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (PSR ¶ 1). That offense carries a maximum term of twenty years' imprisonment and no mandatory minimum. The Plea Agreement contained a stipulated Guidelines calculation under the United States Sentencing Guidelines. That calculation matches the Guidelines calculation in the PSR. Specifically, the Plea Agreement and the PSR both provide that Gomera Lopez's total offense level is 35, her Criminal History Category is I, and that, as a result, her Guidelines range is 168 to 210 months' imprisonment. (PSR ¶¶ 53, 57, 90). This calculation reflects a base offense level of 38 under U.S.S.G. § 2D1.1(a)(2)(B)(i), based on the parties' stipulation that use of a controlled substance involved in the offense resulted in the Victim's death; a 2-level enhancement under § 2D1.1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing a controlled substance; a 2-level reduction under § 2D1.1(e)(2)(B)(ii) and § 3B1.2(b) for performing a low-level trafficking function while motivated by an intimate relationship; and a 3-level reduction for acceptance of responsibility under § 3E1.1. (PSR ¶¶ 44-52).

According to the Sentencing Commission's Judiciary Sentencing Information data, among 137 defendants sentenced over the last five fiscal years under § 2D1.1 with fentanyl as the primary drug type, a final offense level of 35, and Criminal History Category I, excluding those who received substantial-assistance departures, the mean sentence imposed was 145 months and the median was 144 months. (PSR App. A).

## III. Discussion

### A. Applicable Law

Even after *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Sentencing Guidelines still provide guidance to sentencing courts. And district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007).

Following a court's calculation of the appropriate Guidelines range, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a), when imposing a sentence. *Id.* & n.6. They are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the purposes of sentencing; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing—namely:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B. The Nature and Seriousness of the Offense**

The nature of the defendant's conduct justifies a substantial sentence. A person is dead and many others—both witting and unwitting consumers of narcotics—were harmed. Three packages of counterfeit pills reached the Victim's home before his death, and a fourth arrived after his body was found. The conspiracy of which the defendant was a part shipped more than 130 kilograms of fentanyl mixtures into homes across the country in envelopes designed to look like ordinary mail, containing pills designed to look like ordinary medicine.

The defendant's participation in that enterprise was not one-off. Over at least seven months, she processed customer payments, kept the ledger, bought the equipment, transported the binder, and moved the product. (PSR ¶ 31). She did so for a commission and when the conspiracy's payment infrastructure collapsed under platform scrutiny, she helped rebuild it in her own name.

Two features of that conduct bear particular emphasis.

First, the defendant was paid. She received an eight percent cut of the drug customer payments that ran through her accounts, as confirmed through the ledger found during the search of the apartment. (PSR ¶ 31). Whatever else motivated her, she was compensated on a commission basis for the volume of narcotics proceeds she processed, an arrangement that gave her a direct financial stake in how much fentanyl the operation moved. And the operation moved a lot of it.

Second, and perhaps more troubling, the defendant's payment-processing function existed, at least in part, because of law enforcement pressure. As the defense submission itself explains, the defendant "processed payments through her own mobile payment accounts when Mr. Cabral Rodriguez's payment applications were flagged and shut down." (Def. Ltr. at 3). That was a deliberate step to keep the operation's revenue flowing after the platforms had detected and closed its existing channels, and the defendant took it knowing why those channels had been closed. Substituting a clean identity for a flagged one, and then maintaining the ledger that tracked the resulting proceeds, is a function that requires trust, awareness, and a willingness to absorb personal risk on the conspiracy's behalf that the defendant voluntarily assumed.

Nevertheless, the Guidelines range overstates the defendant's culpability. The base offense level of 38 turns on the death-resulting stipulation, and § 2D1.1(a)(2)(B)(i) applies without regard to a given defendant's proximity to the fatal transaction. There is no reason to believe that the defendant selected the Victim or pressed the pills he received. And although the defendant is

responsible for the entirety of the drugs trafficked by the business she helped Cabral Rodriguez run, the defendant personally handled only some fraction of the business's drug transactions.

### C. The Need to Promote Deterrence and Incapacitation Confirms the Need for a Substantial Custodial Sentence

General deterrence has unusual force here. Mail-order fentanyl distribution is a low-visibility, high-volume crime that depends on people willing to lend their names to payment accounts and their apartments to inventory. A meaningful custodial sentence communicates that participating in a large-scale drug distribution business will be met with proportionate consequences.

Specific deterrence also matters here. The defendant's record and her conduct in custody are to her credit. (PSR ¶¶ 5, 57, 81). But compliance in a facility where the defendant is watched and has nothing to gain from misconduct tells the Court relatively little about the choices she will make once she is released. Those were the circumstances that produced this offense. The defendant voluntarily entered the conspiracy while employed, took a commission on the proceeds she handled, and continued for roughly seven months, until law enforcement interceded. (PSR ¶¶ 31, 83-84).

Further, the public that § 3553(a)(2)(C) directs this Court to protect extends to every household that received one of the more than 130 kilograms of counterfeit pills this conspiracy mailed. (PSR ¶ 37). The Victim was in Raleigh, North Carolina and never met the people who sold to him. The mail insulates the seller completely, with no transaction at which anyone might notice a customer in distress and no practical limit on how many homes a single operation reaches in an afternoon. Cabral Rodriguez, with the defendant's assistance and knowledge, mailed more than thirty envelopes in roughly one hour on March 7, 2025. (PSR ¶¶ 12-15). The defendant bought the binding agent and the label printer that turned bulk fentanyl into tablets that passed for medicine, and she supplied the payment channels that kept the operation collecting after its accounts were shut down. (PSR ¶ 31).

This case demands a sentence that will send a clear message to the defendant and to others who participate in the market for counterfeit prescription pills that this conduct is intolerable and will result in serious consequences.

### D. The Defendant's Request for Time Served Should Be Rejected

The defense submission makes six principal arguments, but none supports a sentence of time served.

First, the defendant asks the Court to weigh the defendant's relatively limited role in the offense. (Def. Ltr. at 3-4). The Government agrees that her role was more limited than some others in the conspiracy, but that agreement is already reflected by the two-level reduction under § 2D1.1(e)(2)(B)(ii) and § 3B1.2(b), and, far more consequentially, in the Government's agreement to accept a plea to a lesser-included offense that removed a ten-year mandatory minimum. The Government has therefore already reduced her sentencing exposure by at least 120 months before this Court weighs a single § 3553(a) factor. Moreover, the defendant's role must

be considered in conjunction with the scale of the narcotics trafficking in which she knowingly participated, and the tragic death that resulted from it. Her comparatively limited role therefore does not justify a sentence of time served.

Second, the defendant's characterization also significantly understates the record in places. The submission states that the defendant "did not directly benefit from the related drug transactions." (Def. Ltr. at 4). The PSR accurately states that she received an eight percent cut of the customer payments she processed. (PSR ¶ 31). The Government accepts that her relationship with Cabral Rodriguez was a substantial motivation for her participation. But she was also compensated for it and, further, benefited indirectly from Cabral Rodriguez's much larger profits from the scheme through her relationship and cohabitation with him.

Third, the defendant emphasizes that she does not speak English, knew almost no one in the United States, and was dependent on Cabral Rodriguez. (Def. Ltr. at 3). The Government accepts these factors likely influenced her choices. But they do not describe a person incapable of independent action. The defendant maintained her own financial accounts, made purchases, and kept written records. She had held lawful employment in Troy, New York, for a year before the conspiracy began, and worked at a store in Yonkers during it. (PSR ¶¶ 83-84).

Fourth, the defendant's family situation is sympathetic. The Government has factored it into its recommendation. The authorities the defense cites, however, address *extraordinary* family circumstances, and the operative facts here simply do not fit that framework. The defendant's daughter has lived with her grandparents in Santo Domingo since 2022, before the defendant entered the United States and years before this offense. (PSR ¶¶ 67-68). The defendant was not her daughter's caretaker at the time of her arrest, and her incarceration did not disrupt an existing caregiving arrangement. The loss the family has suffered is the loss of remitted income, which while serious, is also a consequence common to nearly all incarcerated defendants who support relatives abroad. A sentence of time served on that basis would be difficult to reconcile with the sentences imposed on similarly situated defendants.

Fifth, the defendant argues that removal supplies both deterrence and public protection, such that little incarceration is needed. (Def. Ltr. at 6-7). The premise that deportation reliably protects the American public is undercut by the facts of this very case, however. Cabral Rodriguez (the defendant's co-conspirator) was convicted of a New Jersey narcotics offense, removed from the United States in 2005, and returned unlawfully, and he then built a fentanyl operation in Yonkers. (PSR ¶¶ 27-30). Removal is a collateral consequence of conviction. It carries no assurance that the defendant will remain outside the United States. Nor does removal answer the need for just punishment under § 3553(a)(2)(A).

Sixth, the defendant also contends that a sentence of time served affords adequate deterrence because certainty of apprehension, rather than severity of punishment, is what deters crime. This point too is unpersuasive.

The authorities the defendant cites for this proposition are not what they appear to be. The defendant represents that "[c]ourts in this District and in the Eastern District have said the same," but the sole authority offered from this District, *United States v. Velazquez*, 2017 WL 2782037 (S.D.N.Y. May 26, 2017)—and the one upon which the defendant principally relies—is not a judicial decision at all. It is a sentencing memorandum filed by defense counsel seeking a variance

for a defendant. The remaining two authorities, *Bannister* and *Lawrence*, are non-binding district court opinions of the same judge, Judge Weinstein of the Eastern District of New York. Neither case involved a defendant whose narcotics distribution killed anyone. Two opinions of one district judge, and a defense lawyer's brief do not remotely establish that the Guidelines range in a fatal fentanyl case should collapse to time served.

The empirical literature also does not reflect what the defendant says it does. Severity-based deterrence is routinely found. *See* Eric Helland & Alexander Tabarrok, *Does Three Strikes Deter? A Nonparametric Estimation*, 42 J. HUM. RES. 309, 309 (2007) (isolating deterrence from incapacitation by comparing offenders convicted of a strikeable offense under California's three-strikes law against a matched group convicted of a lesser one, so that both groups remained at liberty, and finding that the enhanced penalty "significantly reduces felony arrest rates among the class of criminals with two strikes by 17-20 percent"); *see also* Francesco Drago et al., *The Deterrent Effects of Prison: Evidence from a Natural Experiment*, 117 J. POL. ECON. 257, 258, 275 (2009) (finding each additional month in expected sentence reduces the propensity to recommit a crime by approximately 1.3 percent, with the strongest response found for shorter prior sentences).

Some studies find relatively weak marginal deterrence, but those, by contrast, examine years added to sentences that are already extremely long. None of that research examines the difference between fifteen months and 68 months.

Indeed, deterrence applies with greatest force to calculated, economically motivated conduct—like that of the defendant here—rather than to impulsive acts. (PSR ¶ 31). She (and others like her) is precisely the sort of offender the literature identifies as highly responsive to consequences.

## IV. Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 68 months' imprisonment, to be followed by three years' supervised release.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________________
James Mandilk
Henry L. Ross
Joe Zabel
Assistant United States Attorneys
(212) 637-2442 / 2453 / 1559

cc: Defense Counsel